## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *MARK LAMPRON,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:13-cv-189-GZS* |
| | ) | |
| *GROUP LIFE INSURANCE AND* | ) | |
| *DISABILITY PLAN OF* | ) | |
| *UNITED TECHNOLOGIES* | ) | |
| *CORPORATION, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

### MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S
### MOTION TO CONDUCT DISCOVERY

Plaintiff Mark Lampron seeks discovery bearing on his claim against defendants Group Life Insurance and Disability Plan of United Technologies Corporation ("Plan") and Liberty Life Assurance Company of Boston ("Liberty") for unpaid benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.  *See* Plaintiff's Motion to Conduct Discovery ("Motion") (ECF No. 12); First Amended Complaint and Demand for Jury Trial ("Amended Complaint") (ECF No. 2) ¶¶ 93-100.[1]  For the reasons that follow, the Motion is denied.

### I.  Applicable Legal Standards

"[W]hen it comes to discovery in a case involving review of an ERISA benefits determination, the law in this circuit is set by *Liston* [*v. Unum Corp. Officer Severance Plan*, 330 F.3d 19 (1st Cir. 2003)], pursuant to which [a plaintiff] must offer at least some very good reason to overcome the strong presumption that the record on review is limited to the record before the

---

[1] The court severed Lampron's claims against his employer, Pratt & Whitney, a division of United Technologies Corporation, from those against Liberty and the Plan, which are set forth in Count VI of the Amended Complaint and form the subject matter of this action.  *See generally* Amended Complaint; Procedural Order (ECF No. 1).

administrator." *Grady v. Hartford Life & Accident Ins. Co.*, Civil No. 08-339-P-H, 2009 WL 700875, at *1 (D. Me. Mar. 12, 2009) (citations and internal punctuation omitted).

This is true even when, as here, a plaintiff seeks discovery regarding asserted bias on the part of an insurer operating under a so-called "structural conflict of interest." *See, e.g., Ramsdell v. Huhtamaki, Inc.*, No. 1:11-cv-00398-GZS, 2012 WL 1440613, at *4-*5 (D. Me. Apr. 23, 2012) (applying *Liston* standard to motion to conduct discovery related to insurer's "conflicts" and designed to provide evidence of its bias and procedural irregularities in processing plaintiff's claim).[2]  The "mere existence of a structural conflict of interest" does not justify discovery.  *Id.* at *5.  Rather, a plaintiff must make "a threshold showing that the denial of benefits was improperly influenced by the administrator's conflict of interest[,]" articulating "case-specific circumstances demonstrating a possibility of bias in the denial of the claim."  *Id.* (citations and internal punctuation omitted).

## II.  Factual Background

Lampron worked as a machinist for Pratt & Whitney, a division of United Technologies Corporation ("UTC"), in North Berwick, Maine, for approximately 22 years.  Amended Complaint ¶¶ 4, 18-21.  UTC established a group disability benefit plan for its employees that included both STD and LTD benefits.  Heins Decl. ¶¶ 4-5.  Liberty administers claims for both

---

[2] A structural conflict of interest exists when the same entity that makes claims decisions pays benefits.  *See, e.g., Denmark v. Liberty Life Assurance Co. of Boston*, 566 F.3d 1, 7 (1st Cir. 2009).  Liberty argues, in passing, that there was no structural conflict in this case because the short-term disability ("STD") benefits that it terminated were funded by Lampron's employer.  *See* Defendants' Objection to Motion To Conduct Discovery ("Objection") (ECF No. 18) at 9-10 & n.14.  However, Liberty terminated Lampron's STD benefits approximately three weeks before he would have qualified for long-term disability ("LTD") benefits, which Liberty both administers and pays.  *See* Administrative Record ("Record") at 145, 203; Declaration of Heather Heins ("Heins Decl."), Record at 1-5, ¶ 5.  In these circumstances, Liberty fairly can be characterized as having had a structural conflict of interest.  *See, e.g., Shoup v. Metropolitan Life Ins. Co.*, No. CV 12-01337-PHX-FJM, 2013 WL 221498, at *1 (D. Ariz. Jan. 18, 2013) (agreeing with claimant, in circumstances in which insurer administered an STD plan funded by claimant's employer as well as an LTD plan funded by the insurer, that "a structural conflict of interest is not necessarily negated by delegating authority to a third-party administrator"; noting that "[i]t is conceivable that the LTD benefits Plan could influence MetLife's STD claim management practices").

STD and LTD benefits under the Plan. *Id*. ¶ 5. However, STD benefits are self-funded by UTC, and LTD benefits are funded by a group policy issued by Liberty. *Id*.

UTC "delegated responsibility to Liberty for determination of eligibility for Sick Pay, STD and LTD benefits, including discretionary authority to interpret and construe the terms and provisions of the plan and to direct reimbursement." Record at 76. Benefits "will be paid only if . . . Liberty decides in its discretion that the applicant is entitled to them." *Id*.

To receive STD benefits, a claimant must be unable, due to a medical condition, "to perform the material and substantial duties of [his] current job or a similar job for more than 5 consecutive scheduled workdays[.]" *Id*. at 64. STD benefits are payable for a maximum of 26 weeks. *Id*. at 68. To receive the first 24 months of LTD benefits, a claimant must be unable as a result of injury or sickness "to perform the Material and Substantial Duties of his Own Occupation[.]" *Id*. at 12. To continue LTD benefits, a claimant must thereafter be "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." *Id*. For purposes of LTD, a claimant's "Own Occupation" is defined as the "occupation that he was performing when his Disability or Partial Disability began[,]" as such occupation "is normally performed in the national economy." *Id*. at 14.

In September and October 2009, Lampron began experiencing severe and debilitating panic attacks at work, necessitating several trips to the Pratt & Whitney medical department as well as to the emergency room. *Id*. at 172, 238; Amended Complaint ¶¶ 36-37. During the month of October 2009, he saw his primary care physician, Dr. Alexander Brazalovich, on October 8, 13, 20, and 26, 2009, for treatment related to the panic attacks, and phoned Dr. Brazalovich's office on October 27, 28, and 29 with concerns regarding medication side effects. Record at 233-38, 248. Dr. Brazalovich made several medication adjustments in October 2009

when Lampron complained of side effects, ultimately prescribing lorazepam (Ativan) and sertraline (Zoloft). *See id.* at 235-42; *see also id.* at 168.

On October 13, Dr. Brazalovich indicated that Lampron could return to work on October 16. *Id.* at 237. Lampron reported to Dr. Brazalovich on October 20 that, although he had previously had panic attacks only at work, he had begun to have them at home, and they seemed to be getting worse. *Id.* at 236. Dr. Brazalovich referred him to Dr. David Jones (presumably a psychiatrist) and wrote an "out of work slip" for three weeks to allow the medications to work and permit Lampron to see a psychiatrist. *Id.*

On or about October 20, 2009, Lampron applied for "Sick Pay/STD Benefits" effective October 17, 2009, on the basis that frequent panic attacks prevented him from working. *Id.* at 103, 358. Pratt & Whitney reported that Lampron worked the weekend shift, Friday, Saturday, and Sunday, that he had worked for five hours on October 10, 2009, had been out October 11, 2009, had seen his doctor on October 13, 2009, and had been cleared to return to work on October 16, 2009, but had worked for only four hours that day and had seen his doctor on October 20, 2009. *Id.* at 356.

At Liberty's request, Dr. Brazalovich completed a functional mental status evaluation ("FMSE") dated November 2, 2009, in which he stated that Lampron "gets panic attacks at work, very anxious, not able to concentrate" and that he had "very little functional ability" when having those attacks. *Id.* at 328. He stated that work readiness would be measured by "when [Lampron is] able to stay at work and not get panic attacks and [be] sent to medical or home[.]" *Id.* at 329.

There is no indication that Lampron saw "Dr. David Jones"; however, on November 3, 2009, he saw Essie Leach, PA-C, of Counseling Services, Inc. ("CSI") for a psychiatric evaluation. *Id.* at 172-175. Lampron told Leach that (i) he had suffered from anxiety for 10

years, (ii) his anxiety had been getting progressively worse for the prior two to three years, and, (iii) as of the end of September, he was having panic attacks three to four times a day lasting between five and 10 minutes, resulting in two emergency room visits.  *Id*. at 172.  He noted that, following the emergency room visits, Dr. Brazalovich had tried him on Lexapro for a couple of days, which did not work well, then prescribed Ativan, and had most recently added Zoloft.  *Id*.  He reported that, with the use of Zoloft, his panic attacks had diminished from three to four per day to three per week, and he had learned breathing techniques that had helped him cope with the panic attacks.  *Id*.  Leach diagnosed Lampron with panic disorder without agoraphobia and generalized anxiety disorder and encouraged him to continue with his Zoloft, use his breathing techniques during a panic attack, take a smaller dosage of Ativan if needed, and seek counseling, which Lampron agreed to do.  *Id*. at 174-75.

Leach also completed an FMSE for Liberty dated November 3, 2009, noting that Lampron was alert and oriented, with a good memory, cognition, judgment, and insight, had an anxious mood, and had an anxious affect when he first started talking but then calmed down.  *Id*. at 301-02.  She stated that the measure of his work readiness was "[w]hen his mood is stable and he is not having frequent panic attacks" and that his return to work would be added to CSI's treatment plan.  *Id*. at 303.  Her timeline for return to work was "based on how [Lampron] is feeling[.]"  *Id*.  She added that Lampron was feeling better and that it was hard to say exactly how long he would be out of work; "4-6 months perhaps[.]"  *Id*. at 304.  She commented:

> Mr. Lampron has been having frequent panic attacks that have been debilitating. He has been started on Zoloft which takes at least 4-6 weeks to work.  He may need an increased dose.  It all depends on how he's doing.

*Id*.

Lampron saw Dr. Brazalovich again on November 9, 2009.  *Id*. at 239.  Dr. Brazalovich noted a back to work date of January 10, 2010, and continued Lampron's prescriptions for lorazepam and Zoloft.  *Id*.

By letter to Lampron dated November 25, 2009, Liberty apprised him that it had approved his STD claim through November 30, 2009, and that additional medical information was needed (besides the Leach office visit note and FMSE of November 3, 2009, and the Brazalovich FMSE of November 2, 2009) to support disability past November 30, 2009.  *Id*. at 296.

Lampron returned to Dr. Brazalovich's office on December 4, 2009.  *Id*. at 240.  He reported that his anxiety medications had not been working, it had not been a good week, and he had had four panic attacks that week.  *Id*.  Dr. Brazalovich increased his dosage of sertraline and completed an FMSE for Liberty.  *Id*. at 240, 274-78.  In the FMSE, he described Lampron as oriented, with intact judgment and insight, but anxious and nervous and having panic attacks at home, making it difficult to concentrate.  *Id*. at 274-75.  He described the measurement of work readiness as "when panic attacks decrease enough to allow [Lampron] to function at work."  *Id*. at 277.

On December 15, 2009, Lampron saw CSI psychiatrist Dr. Beata Zarankow for psychiatric medication management.  *Id*. at 170-71.  Lampron told Dr. Zarankow that Dr. Brazalovich had increased his Zoloft dosage due to anxiety and that "overall his panic attacks ha[d] decreased somewhat," although he needed to make behavioral changes to help reduce them.  *Id*. at 170.  Dr. Zarankow maintained Lampron's Zoloft dosage, increased his Ativan dosage, and recommended that he begin working with a therapist to address his symptoms of panic and anxiety.  *Id*.  She stated that she had filled out paperwork for Liberty "with goals of

6

remission of panic for eight weeks prior to returning to work." *Id.* She indicated that Lampron should return for medication management in eight weeks. *Id.*

On the same date, Dr. Zarankow completed an FMSE for Liberty in which she described Lampron as anxious but oriented, with intact memory, cognition, judgment, and insight, and stated that his panic attacks interfered with his ability to operate machinery, he had intact activities of daily living, he could perform his current job description, and his work readiness was measured by whether he was panic-free for eight weeks, with a goal of remission and a timeline of two months. *Id.* at 270-72. She noted that cognitive behavioral therapy and medication management were indicated, and that Lampron had just started treatment. *Id.* at 272.

Liberty referred Lampron's claim to J. Leslie Kurt, M.D., a consulting physician board-certified in psychiatry, for a full file review to assess for psychiatric impairment precluding occupational functioning as a machinist from December 1, 2009, onward. *Id.* at 264, 269. In a six-page report dated December 17, 2009, Dr. Kurt indicated that she had reviewed (i) Dr. Brazalovich's notes of October 20, October 26, October 28, November 9, and December 4, 2009, (ii) Dr. Brazalovich's November 2, 2009, FMSE, (iii) Leach's November 3, 2009, psychiatric evaluation and FMSE, (iv) Dr. Brazalovich's December 4, 2009, FMSE, and (v) Dr. Zarankow's December 15, 2009, FMSE. *Id.* at 266-68. She also reviewed an activities questionnaire that Lampron completed on October 26, 2009. *Id.* at 268-69.

She concluded that disability was not supported as of December 1, 2009, *id.* at 264, stating:

> While the claimant continues to report panic attacks, as of 11/3/09, their frequency and severity appears to have diminished substantially with Zoloft therapy, even though Ativan is being under-utilized. While multiple treaters have opined that the claimant is unable to perform his job, due to panic attacks, available documentation reflects the absence of significant mental status exam findings or other specific functional impairments that would reasonably be

expected to result in occupational restriction.  The claimant reports that he is able to perform his usual daily activities and drive his children to school and various activities without difficulty.  But for his complaints of panic attacks, he appears to be functioning at his usual baseline.  In the absence of significant clinical findings, continued psychiatric impairment is not reasonably supported based solely on the claimant's report of non-verifiable symptoms of panic attacks.

Additionally, employment problems (job dissatisfaction, job stress and interpersonal conflict) and other motivational issues may be impacting on the claimant's perception of disability and continued leave of absence.

*Id*. at 266.  She noted that if additional documentation became available, she would be happy to review it.  *Id*. at 264.

By letter dated December 21, 2009, Liberty denied Lampron's claim for benefits beyond November 30, 2009.  *Id*. at 261-63.  It stated that there was "a lack of clinical evidence to support restrictions and limitations precluding [Lampron] from performing [his] job" and, therefore, he no longer met the Plan's definition of disability.  *Id*. at 262.  By letter dated January 11, 2010, Lampron appealed the denial of benefits, stating that his providers would send further documentation.  *Id*. at 254.

Lampron next saw Dr. Brazalovich on January 11 and 25, 2010.  *Id*. at 241-42.  At the January 11 visit, he reported that he was still having anxiety attacks, although not as frequently as before, his lorazepam dosage had been increased by the psychiatrist, his disability had been denied for lack of a treatment plan and too lengthy a period between visits, and he was on a waiting list for counseling.  *Id*. at 241.  At the January 25 visit, he reported that he had seen therapist Linda Reed the prior week and that his anxiety seemed stable, with the last attack on January 14, 2010.  *Id*. at 242.  Dr. Brazalovich noted that Lampron's anxiety had improved, he was starting counseling, he would see a psychiatrist the following week, and he would continue sertraline.  *Id*.

At Lampron's request, Linda Reed, LCPC, ATR-BC, of Psychiatric Associates of Southern Maine ("Psychiatric Associates") wrote a letter dated February 1, 2010, recounting that Lampron had contacted Psychiatric Associates on December 16, 2009, to initiate therapy and that, on January 19, 2010, she had completed an intake with him in which he described symptoms of panic disorder and anxiety and she had recommended outpatient therapy on a weekly basis. *Id*. at 245. Reed noted that she had seen Lampron on January 26, 2010, and that "the next appointment is scheduled for 2/2/10 with the intent to complete treatment goals." *Id*.

Lampron saw a new CSI psychiatrist, Dr. David Melman, for medication management on February 9, 2010. *Id*. at 168. Lampron reported that (i) he was under financial stress, (ii) he had started counseling to help learn calming skills and for talk therapy, and (iii) his medications seemed to be helping. *Id.* Dr. Melman noted that "[t]he increase in Ativan has helped with his anxiety, but [he] has not had eight weeks of being panic free as was the goal in the previous session." *Id.* Dr. Melman "[d]iscussed [Lampron's] return to work and advised starting part time with a less stressful environment with clearance from those who know him better, i.e., his PCP [primary care physician] and his current counselor, as [Lampron] has seen a different professional here each visit." *Id.* Dr. Melman maintained Lampron on the same dosages of Ativan and Zoloft. *Id*.

Lampron saw Dr. Brazalovich on February 15, 2010. *Id*. at 200. He reported that he was unhappy with his psychiatrist, who gave him no guidance, and that he was continuing to have anxiety attacks. *Id*. Dr. Brazalovich noted that Lampron should continue his medications and referred him to "Dr. Maidman." *Id*.

At Liberty's request, Dr. Kurt performed a second file review dated March 1, 2010, in which, in addition to the materials considered in her prior report, she reviewed (i) progress notes

of visits to Dr. Brazalovich on October 8 and 13, 2009, and January 11 and 25, 2010, as well as an on-call record of October 27, 2009, (ii) Reed's February 1, 2010, letter, and (iii) Dr. Zarankow's December 15, 2009, progress note. *Id.* at 228-31. In her eight-page report, she concluded that "[a]dditional medical records provided by Drs. Brazalovich and Zarankow reasonably support psychiatric impairment precluding occupational function from 12/1/09 through 1/25/10, due to complaints of persistent panic attacks, despite limited mental status findings and relative preservation of activities-of-daily-living functioning." *Id.* at 225. However, she added:

> Dr. Brazalovich's progress notes indicate steady, incremental improvement in panic attacks in December 2009 and January 2010 without significant medication changes. In an office visit of 1/25/10, Dr. Brazalovich noted the absence of any panic attacks since 1/14/10. He assessed [Lampron's] condition as improved and continued Zoloft 100 mg daily. Given the significant improvement noted on 1/25/10, a clinical update with provider contact is suggested to assess for psychiatric impairment precluding occupational functioning from 1/26/10 forward.

*Id.* at 225-26.

Liberty adopted Dr. Kurt's suggestion and tasked her to "perform a full file review with provider contact to assess for psychiatric impairment and any associated limitations and restrictions from 1/25/10 through 4/17/10 and beyond." *Id.* at 150.

By letters dated March 5, 2010, Liberty contacted Dr. Brazalovich, CSI, and Reed seeking further information, including completion of FMSE forms. *Id.* at 211, 216, 221. By letter of the same date, Liberty informed Lampron that his STD claim had been approved through January 25, 2010, and that it had requested additional information from Dr. Brazalovich, Reed, and CSI. *Id.* at 205. It invited him to forward any additional information. *Id.*

Lampron saw Dr. Brazalovich again on March 8, 2010, and reported that he had had several minor panic attacks that resolved quickly, did not feel that he could go back to Pratt

& Whitney, talked with his counselor about doing something different, and wanted to get a commercial driver's license.  *Id.* at 199.  Dr. Brazalovich noted that Lampron was scheduled to see "Dr. Fortier" the next day and recommended that he continue developing coping skills to deal with his anxiety without using medications and consider increasing sertraline and stopping lorazepam.  *Id.*

Lampron returned to CSI for further medication management on March 9, 2010, and was seen by a new psychiatrist, Dr. Phillips.  *Id.* at 167.[3]  Lampron told Dr. Phillips that he was taking Ativan only once a day so as not to become dependent on it and was "using more breathing techniques when his panic attacks come on and this seems to work for him."  *Id.* Lampron inquired about increasing his Zoloft in order to eliminate his Ativan altogether.  *Id.*  He told Dr. Phillips that he was "looking into changing careers[.]"  *Id.*  Dr. Phillips increased Lampron's Zoloft dose and continued his Ativan.  *Id.*

Dr. Phillips completed what appears to be a partial FMSE for Liberty (one of three pages) describing Lampron as pleasant, well-groomed, anxious, and depressed but not suicidal.  *Id.* at 196.  Dr. Brazalovich declined to complete an FMSE form, commenting that the form "need[ed] to be filled out by [a] psychiatrist[.]" *Id.* at 197.  He supplied copies of his February 15, 2010, and March 8, 2010, office notes.  *Id.* at 198-200.

Reed submitted a letter to Liberty dated March 15, 2010, in which she stated that Lampron had been seen for an intake assessment at Psychiatric Associates on January 19, 2010, had been diagnosed with panic disorder without agoraphobia, and had been "seen on a weekly basis with the goals of learning techniques to reduce the anxiety, recognize symptoms before they produce an attack, and to return to work utilizing these techniques."  *Id.* at 193.

---

[3] Dr. Phillips' first name is illegible.  Record at 167.

In March 2010, Lampron's disability claim was "escalated to LTD." *Id*. at 95. As a result, Monique Furgalack, assigned as Lampron's LTD case manager, took over the management of his STD claim file from Kimberly Cannamela, his STD case manager. *Id*. at 203, 205-06. By letter to Lampron dated March 5, 2010, Cannamela on behalf of Furgalack explained that, if Lampron's disability continued, his STD benefits would end on April 16, 2010, and, therefore, "[d]uring the remainder of this benefit period," Liberty would be reviewing his claim for consideration under the LTD portion of the Plan. *Id*. at 203. By letter dated March 16, 2010, Liberty requested additional information in order to consider Lampron's claim for LTD benefits. *Id*. at 181-82.

On April 20, 2010, Dr. Kurt placed a call to Dr. Phillips at CSI and left a detailed voice message. *Id*. at 154. Her call was returned by a CSI administrative assistant who told her that none of the four psychiatrists who had evaluated Lampron was still practicing at CSI and that Lampron was scheduled to be assessed on May 5, 2010, by a new psychiatrist, Dr. Mullarky. *Id*.

Dr. Kurt spoke with Dr. Brazalovich on April 20, 2010. *Id*. at 163. He told her that he had evaluated Lampron most recently on March 23, 2010, at which time Lampron endorsed no psychiatric symptoms and reported benefit from psychiatric medication and counseling. *Id*. Dr. Brazalovich noted that Lampron also told him that he was using coping skills to handle his anxiety. *Id*. Dr. Brazalovich told Dr. Kurt that (i) he had identified no medical issues that would limit Lampron's occupational functioning, (ii) Lampron reported that he was discussing a possible return to work with Pratt & Whitney, and (iii) Dr. Brazalovich "deferred ongoing assessment of psychiatric impairment and any associated limitations to [Lampron's] behavioral health treaters." *Id*.

Dr. Kurt spoke with Reed on April 22, 2010. *See id*. at 148. Reed informed her that (i) since she began treating him, Lampron had only reported limited-symptom panic attacks, which had occurred a few times during sessions and which Lampron addressed effectively with deep breathing techniques, (ii) Lampron had made steady progress since January 2010 using various anxiety management techniques and medication and had not had a limited-symptom panic attack for three to four weeks, (iii) Lampron's therapy sessions recently had been increased to biweekly because of his clinical progress and had focused on exploration of occupational issues and a return to work plan, (iv) Lampron did not want to return to his job as a machinist, where he worked long hours in a confining factory setting, was interested in obtaining a more autonomous job, and preferred to work outdoors, (v) Lampron had been "encouraged to meet with his employer to discuss alternate positions and training opportunities and ha[d] done so," and (vi) Reed believed that Lampron had been ready to return to work since April 1, 2010. *Id*. Reed noted that Lampron's "anxiety seem[ed] to be directly related to his job and the work environment" and stated that she had "worked with him over time on a plan for anxiety management when he return[ed] to his workplace" and she "believe[d] that he ha[d] developed sufficient skills to cope effectively with anxiety and panic attacks if they recur[red] in the workplace." *Id*. at 148-49 (internal quotation marks omitted).

In a 12-page Clinical Case Review dated April 22, 2010, Dr. Kurt concluded:

> Medical documentation does not reasonably support marked psychiatric impairment precluding occupational functioning as a machinist from 4/1/10, in consensus with the claimant's therapist, Linda Reed, LCPC. She opined in a lengthy telephone review on 4/22/10 that, based on his clinical progress, she believes the claimant has been ready to return to work for the last three weeks.

*Id*. at 150. Dr. Kurt indicated that, in addition to attempting unsuccessfully to speak with a CSI psychiatrist, speaking to Dr. Brazalovich and Reed, and relying on the same materials reviewed

in connection with her prior two reports, she had reviewed (i) progress notes of Dr. Brazalovich dated February 15, 2010, and March 8, 2010, (ii) CSI progress notes of Dr. Melman dated February 9, 2010, and Dr. Phillips dated March 9, 2010, and (iii) Reed's letter dated March 15, 2010. *Id*. at 154-60.

She noted that the medical records "reflect[ed] steady improvement with limited mental status findings and relative preservation of activities-of-daily-living functioning" and that Lampron "appear[ed] to have benefited from anxiety management skills training and a recent increase in Zoloft." *Id*. at 151.

By separate letters dated April 27, 2010, Liberty denied Lampron's STD and LTD claims. *Id*. at 140-41, 143-46. With respect to STD benefits, it concluded:

> Based on the board certified physician's review of your file, the medical documentation does not support restrictions and limitations precluding you from performing the duties of your job beyond March 31, 2010. Therefore, you do not meet the Plan's definition of disability beyond March 31, 2010, and we must close your claim.

*Id*. at 145.

Lampron appealed Liberty's termination of his STD benefits. *Id*. at 132. He submitted a personal statement explaining his inability to return to his job at Pratt & Whitney, *id*. at 133, a May 5, 2010, office note of a new treating psychiatrist, Dr. Kevin Mullarky of CSI, *id*. at 134-35, and a May 6, 2010, note "To Whom It May Concern" from Dr. Brazalovich, *id*. at 136.

In his May 5 office note, Dr. Mullarky noted that Lampron reported having had one panic attack in the last month, was "seeking a career change and [was] trying to negotiate with his disability insurance having long term disability through this process." *Id*. at 134. Lampron expressed his frustration with having multiple psychiatrists and his hope that Dr. Mullarky could treat him on a consistent basis. *See id*. Dr. Mullarky "[e]xplained . . . that this clinic isn't set up

14

to do evaluations for work recommendations[.]" *Id.*  Lampron reported to Dr. Mullarky that his medicines "work[ed] well for him[,]" that he had decreased Ativan tablets from two to one and would like to decrease further to a half tablet, and that he used "breathing techniques to help him with anxiety that comes up." *Id.*  His mental status examination was normal.  *Id.*

> In his May 6, 2010, note, Dr. Brazalovich stated:
>
> [Lampron] has been a patient of mine since October 2009.  Since that time his anxiety has increased significantly.  So much so, that he is seeing a psychiatrist.  When talking with [Lampron] and work is brought up his anxiety increases.  His concern about making mistakes at work is causing severe anxiety.

*Id.* at 136.

Lampron's appeal was referred to Liberty's Appeals Unit and assigned to Chuck Johnson.  Heins Decl. ¶ 11.  Thereafter, nurse reviewer Thomas Sutton performed a file review and determined that the new records did not support the existence of any mental health restrictions and limitations beyond March 31, 2010, as previously noted by Dr. Kurt.  Record at 91.

By letter dated June 9, 2010, Liberty advised Lampron that it was affirming its termination of his STD benefits effective March 31, 2010.  *Id.* at 125.  It stated that its "claim determination [was] based on the medical documentation received and whether this would prevent [Lampron] from returning to work at [his] own job, as a Machinist." *Id.* at 127.

Heins avers that the Record in this case "includes all documents submitted, considered, or generated in the course of making the benefit determination as to Lampron's claim for disability benefits from the Plan."  Heins Decl. ¶ 4.

She states that, "[i]n evaluating claims for benefits under the employee benefit plans for which it acts as the claims administrator, it is Liberty Life's practice and intention to review such claims fairly, without regard to the manner in which the plan is funded (*e.g.*, whether fully

insured by Liberty Life or self-funded and administered by Liberty Life under an administrative services only agreement), and to pay claims consistently and in accordance with the applicable plan provisions, so that those claims which are payable under the plan are paid and those which are not payable are not paid." *Id*. ¶ 6. She asserts that "[t]he employees who make claims decisions on behalf of Liberty Life are not evaluated or compensated on the basis of the amount or number of claims paid or denied" but on the basis of "the quality and accuracy of their claims decisions." *Id*. ¶ 7.

She states that third-party medical vendors do not have authority to make benefit determinations, instead answering specific questions posed to them by Case Managers or Appeal Review Consultants. *Id*. ¶ 13. Liberty (i) "compensates the outside medical vendors pursuant to an arrangement agreed upon before any review is conducted by the physicians employed by the outside vendors" and (ii) "issues payment directly to the outside medical vendors for services rendered by the individual reviewing physicians[,]" which "does not vary based upon the outcome of the physicians' review." *Id*. ¶ 14. According to Heins, Liberty does not compensate the individual reviewing physicians directly and does not know how they are compensated or how much is paid for any particular review. *Id*.

### III. Discussion

Lampron sets forth nine "facts" that he contends give rise to a colorable claim of bias, justifying the conflict/bias discovery that he seeks. *See* Motion at 7-8.[4] He further seeks to discover a Liberty "jobs versus occupation" procedure on the basis that discovery is appropriate when the administrative record contains gaps or the plan administrator has failed to detail its procedures. *See id*. at 9-10.

---

[4] I will refer to these as Lampron's nine "points." They are, in the main, arguments, not facts. *See* Motion at 7-8.

On the basis of these arguments, he seeks discovery in the form of (i) a two-hour deposition of Furgalack to explore her understanding and use of the term "TD" in the claim file, Liberty's claims-handling procedures related to the "job versus occupation" distinction, and the reason Furgalack took over the file once it was "escalated to LTD[,]" (ii) a two-hour deposition of Dr. Kurt to explore Liberty's history of referrals to her and instructions provided by Liberty and the frequency with which she recommends denial of benefits, (iii) 19 interrogatories, and (iv) seven requests for production of documents. *See id.* at 10 & Exhs. A (ECF No. 12-1) & B (ECF No. 12-2) thereto.

### A.  Bid for Evidence Bearing on Conflict/Bias

I turn first to Lampron's nine points in support of his request for "bias/conflict" discovery, concluding, for the reasons set forth below, that he falls short of demonstrating the requisite "very good reason" for the grant of his request.

1.    *Liberty omitted from the Record documents establishing internal policies, procedures, and safeguards required by federal regulations*.  *See* Motion at 7 (citing 29 C.F.R. § 2560.503-1(b)(5)).   Lampron's argument presupposes that Liberty was required to include these materials in the Record; however, he fails to explain why.  Subsection (b)(5) requires only that employee benefit plans *create* certain procedures – specifically, procedures "designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."  29 C.F.R. § 2560.503-1(b)(5).  Lampron omits any mention of the subsections that address disability plans' obligation to *disclose* such materials. *See* Motion at 7; 29 C.F.R. §§ 2560.503-1(g)(1)(v)(A), (h)(2)(iii), (j)(3), & (m)(8).  Those subsections provide for mandatory disclosure in certain circumstances.   *See* 29 C.F.R.

§§ 2560.503-1(g)(1)(v)(A), (h)(2)(iii), (j)(3), & (m)(8). If none of those circumstances pertained, Liberty had no obligation to include subsection (b)(5) materials in the Record. In the absence of reasoned argument, Lampron fails to make a colorable showing that documents were omitted from the Record, evidencing bias on Liberty's part.[5]

2.    *On appeal, Liberty disregarded the updated information contained in Lampron's medical records dated May 5 and 6, 2010, failing to "provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant."* Motion at 7 (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv)); *see also* Reply Memorandum in Support of Plaintiff's Motion To Conduct Discovery ("Reply") (ECF No. 22) at 3 ("Even after Dr. Kurt performed her final case review, Liberty Life received but ignored contrary medical evidence that Mr. Lampron's anxiety was 'severe,' and he could not return to work."). Liberty did not disregard the May 5 and 6, 2010, medical records. Sutton, who conducted a file review following Lampron's appeal, summarized both records but concluded that they did not demonstrate Lampron's continuing disability beyond March 31, 2010. *See* Record at 91. Johnson, in his letter to Lampron denying the appeal, referred to the new evidence and Sutton's

---

[5] Pursuant to subsection (g)(1)(v)(A), internal rules, guidelines, protocols, and other similar criteria must be disclosed if "relied upon in making the adverse determination[.]" 29 C.F.R. § 2560.503-1(g)(1)(v)(A). Subsections (h)(2)(iii) and (j)(3) mandate disclosure following an adverse determination of documents, records, or other information "relevant to the claimant's claim for benefits." *Id.* §§ 2560.503-1(h)(2)(iii) & (j)(3). In turn, such materials are "relevant" if they were (i) "relied upon in making the benefit determination;" (ii) "submitted, considered, or generated in the course of making the benefit determination, without regard to whether [they were] relied upon in making the benefit determination;" (iii) "[d]emonstrate[] compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination;" or (iv) "[i]n the case of a group health plan or a plan providing disability benefits, constitute[] a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination." *Id.* § 2560.503-1(m)(8). With respect to subsection (g)(1)(v)(A) and the first two categories of subsection (m)(8), Heins avers that Liberty included in the Record all documents submitted, considered, or generated in the course of making Lampron's benefit determination. *See* Heins Decl. ¶ 4. The third category of subsection (m)(8) mandates disclosure of evidence of compliance with the subsection (b)(5) procedures, not the procedures themselves. *See, e.g., Palmiotti v. Metropolitan Life Ins. Co.*, No. 04CIV0718LTSJCP, 2006 WL 510387, at *3 (S.D.N.Y. Mar. 1, 2006) ("The regulation, by its terms, only defines 'evidence of compliance' with the required processes and safeguards, rather than the 'processes' themselves, as 'relevant' within the meaning of the mandatory disclosure provision."). The fourth category of subsection (m)(8) seemingly is inapposite.

conclusions regarding it.  *See id*. at 126-27.  As Liberty points out, *see* Objection at 7, neither Dr. Mullarky nor Dr. Brazalovich expressed an opinion that Lampron was unable to return to work at Pratt & Whitney, *see* Record at 134-36.

       3.     *Dr. Kurt failed to conduct a proper "full review with provider contact" because she did not make contact with a psychiatrist or other provider capable of diagnosing or treating mental health disorders, despite Dr. Brazalovich's statement that he deferred to such providers.* *See* Motion at 8; Reply at 3, 5-6.  This assertion rests on Lampron's mistaken belief that Reed, an LCPC (Licensed Clinical Professional Counselor), was not licensed to diagnose or treat mental health disorders.  *See* Motion at 4 & nn.1-2.  Lampron relies on a provision of the Code of Maine Rules pertaining to licensed professional counselors, who "may not diagnose or treat mental health disorders."  02-514 Code Me. R. ch. 2, § 1.  However, the provision pertaining to licensed *clinical* professional counselors, or LCPCs, states that they "may both diagnose and treat mental health disorders."  *Id*. ch. 3, § 1.

       Beyond this, as Liberty argues, *see* Objection at 4-6 & nn.6-7, Dr. Kurt's approach does not betray bias.  She contacted CSI in an attempt to speak to one or more of Lampron's treating psychiatrists but was told that none still practiced at CSI.  *See* Record at 154.  Dr. Melman, the CSI psychiatrist who saw Lampron on February 9, 2010, had indicated in his progress note that Lampron's PCP (Dr. Brazalovich) and his current counselor (Reed), who knew him better, should provide work clearance for him.  *See id*. at 168.  Dr. Brazalovich told Dr. Kurt that he "deferred ongoing assessment of psychiatric impairment and any associated limitations to [Lampron's] behavioral health treaters."  *Id*. at 163.  Reed, who had counseled Lampron regularly since January 2010, *see id*. at 193, certainly qualified as a "behavioral health treater."

In short, Dr. Kurt obtained an opinion from a treating source whom both Dr. Brazalovich and Dr. Melman considered to be in a superior position to provide one.

4.    *Given Dr. Kurt's failure to contact appropriate providers, Liberty should have conducted an independent medical examination ("IME")*.  *See* Motion at 8; Reply at 5-6 & n.5. This point rests on a faulty foundation.  As discussed above, Dr. Kurt did not fail to contact appropriate providers.  She obtained the work-readiness opinion of a qualified provider, Reed, whom both Dr. Melman and Dr. Brazalovich indicated was in a superior position to provide such an opinion.

5.    *Dr. Kurt made multiple contradictory statements regarding Lampron's functional/occupational capacity in her three reviews, first limiting restrictions to December 1, 2009, then through January 25, 2010, and then through March 31, 2010*.  *See* Motion at 8; Reply at 4-5.  As Liberty rejoins, *see* Objection at 4 n.5, the Record reflects that, upon receiving additional evidence, Dr. Kurt considered whether Lampron had met his burden of establishing ongoing disability for later time frames, *see* Record at 150-51, 225.  That approach is hardly indicative of potential bias against Lampron's claim.

6.    *The Record contains "arbitrary" references to "not TD" instead of assessments of Lampron's ability to operate machinery, perform his "own job" for purposes of STD, or perform his "own occupation" for purposes of LTD, and contains little differentiation between these terms at all*.  *See* Motion at 8.  As Lampron points out, *see id*. at 5, the Record contains several notations that his STD benefits were denied for "not TD," *see, e.g.,* Record at 86-87, 105, 128.  Lampron surmises that "TD" refers to the familiar insurance phrase "total disability," pointing out that, for purposes of the Plan, the phrase "total disability" applies only in the context of LTD.  *See* Motion at 5-6; Record at 75 (defining "Total Disability" for purposes of LTD as a

claimant's "inability, solely due to a covered illness or injury, to perform all the material duties of [the claimant's] Regular Occupation").  He argues that Liberty "either misapprehended or disregarded the definition of 'disability' that was applicable to [his] receipt of STD versus LTD benefits."  Motion at 6.  He suggests that this matters because, while Reed thought that he had the general ability to work, even she agreed that his position at Pratt & Whitney exacerbated his anxiety. *See id*. at 4, 8; Reply at 5 & n.2.

Liberty rejoins that the "not TD" notation is plainly shorthand for a determination that Lampron did not meet the criteria for STD benefits.  *See* Objection at 8 n.13.  Indeed, Liberty's letters denying STD and LTD benefits apply the correct standard to each, *see id*. at 140 (quoting LTD definition of disability), 143-46 (quoting STD definition of disability), as does its June 9, 2010, letter denying Lampron's STD benefits appeal, *see id*. at 127 ("This claim determination is based on the medical documentation received and whether this would prevent you from returning to work at your own job, as a Machinist.").

Beyond this, Reed's statements to Dr. Kurt cannot fairly be characterized as indicating Lampron's inability to return to his Pratt & Whitney machinist job.  Although Reed told Dr. Kurt that Lampron did not want to return to his machinist job and was exploring alternative work, which Reed encouraged, and that Lampron's anxiety "seem[ed] to be directly related to his job and the work environment[,]" *id*. at 148-49, she also stated that she had "worked with [Lampron] over time on a plan for anxiety management when he *returns to his workplace*" and that she "believe[d] that he ha[d] developed sufficient skills to cope effectively with anxiety and panic attacks if they recur[red] in the workplace[,]" *id*. at 149 (emphasis added).

Lampron falls short of demonstrating a potential bias emanating from Liberty's purported failure to differentiate between the Plan's STD and LTD definitions of disability.

7.      *None of the providers relied upon by Dr. Kurt opined that Lampron was able to return to his "own job" or "own occupation" or that he had completed an eight-week period of remission from panic attacks, "as required by treating psychiatrist Dr. Zarankow."* Motion at 8. Lampron adds that there is no evidence that Liberty even considered Dr. Zarankow's recommendation in concluding that he was able to return to work. *See id.* Liberty disputes that Dr. Zarankow's "vague comment" was a mandate that Lampron continue to be found disabled until he had been "panic free" for eight weeks. *See* Objection at 4 n.4 (internal quotation marks omitted). In any event, it points out that other mental health professionals held a different view. *See id.*

Lampron's premises that none of his providers told Dr. Kurt that he was able to return to his own job or occupation and that Liberty ignored the Zarankow recommendation are incorrect. Dr. Kurt summarized the entirety of the available medical evidence, including the December 15, 2009, Zarankow progress note and FMSE. *See* Record at 153. She concluded that Dr. Zarankow's evidence, as well as that from other CSI treating psychiatrists and Dr. Brazalovich, reasonably supported disability through March 31, 2010, "due to complaints of persistent limited-symptom panic attacks." *Id.* at 150. However, she found that the medical evidence "reflect[ed] steady improvement[,]" with Lampron appearing to "have benefited from anxiety management skills training and a recent increase in Zoloft." *Id.* at 151. In particular, she recounted that Reed had told her that she had worked with Lampron "on a plan for anxiety management when he return[ed] to his workplace" and that Reed "believe[d] that he ha[d] developed sufficient skills to cope effectively with anxiety and panic attacks if they occur[ed] in the workplace." *Id.* She noted that, "[b]ased on review of available documentation by several psychiatrists and Dr. Brazalovich, Ms. Reed's recommendations and conclusions appear[ed]

reasonable." *Id*. Liberty, in turn, relied on the opinion of Dr. Kurt, as affirmed by Nurse Sutton on appeal. *See id*. at 125-27, 143-45. Lampron's claim of bias on these bases, thus, is not borne out by the Record.

8.      *The Heins Declaration fails to address the fact that Liberty had an LTD case manager, Monique Furgalack, step in and administer the STD claim once it became "escalated to LTD" and Liberty would have been responsible for the payment of LTD benefits*. *See* Motion at 8.   While the Heins Declaration does not address the change in case managers, Liberty correctly points out that the Record elsewhere contains an explanation. *See* Objection at 6 n.9. By letter to Lampron dated March 5, 2010, Cannamela on behalf of Furgalack explained that, if Lampron's disability continued, his STD benefits would end on April 16, 2010, and, therefore, "[d]uring the remainder of this benefit period," Liberty would be reviewing his claim for consideration under the LTD portion of the Plan, Record at 203. She noted that Lampron's receipt of STD benefits did not automatically mean that LTD benefits would be approved given the differences in provisions and requirements applicable to each. *See id*. She advised, "In an effort to better serve you and assist in the possible transition from [STD] to [LTD], your claim will be transferred to a Long Term Disability Case Manager." *Id*. During a phone call with Lampron on March 16, 2010, Furgalack explained that when medical information was received, his claim would be referred for medical review for STD benefits beyond those then approved and for his "pended LTD." *Id*. at 94.[6]

9.      *The mere fact that STD benefits were allowed until three weeks before exhaustion of the elimination period for LTD benefits suggests bias on Liberty's part, especially considering that there was no change in Lampron's condition at the time*. *See* Motion at 8.   In so arguing,

---

[6] A stated goal of the Plan is "[t]o facilitate a seamless transition between Sick Pay, STD and LTD payments." Record at 55.

Lampron glosses over Dr. Kurt's acquisition of information that she reasonably believed indicated a material change in his condition.  Reed, the only mental health provider who had treated Lampron on a regular basis for the panic attacks for which he was initially granted STD benefits, informed Dr. Kurt that he had developed sufficient coping skills to return to his workplace.

For the foregoing reasons, as to each of his nine points, Lampron fails to set forth "case-specific circumstances demonstrating a possibility of bias in the denial of [the] claim." *Ramsdell*, 2012 WL 1440613, at *5 (citation and internal quotation marks omitted).

## B.  Bid for Discovery of Procedure

Lampron next contends that he is entitled to discover Liberty's procedure for comparing the demands of his actual job with the demands of his occupation as performed in the national economy, which he reasons is relevant given the absence of evidence that Liberty duly considered the "job versus occupation" distinction.  Motion at 9-10.  He argues that this discovery should be allowed for the same reasons that this court permitted discovery in *Ganem v. Liberty Life Assurance Co. of Boston*, No. 1:12-CV-00128-GZS, 2012 WL 5464604 (D. Me. Nov. 9, 2012).  *See id.* at 10.

Liberty counters that, even apart from the fact that Lampron did not qualify to continue to receive STD benefits if he could return to his own job or a "similar job[,]" the "job versus occupation" evidence is irrelevant because Liberty determined that Lampron's panic disorder did not in any way limit his ability to work as of April 1, 2010, whether in his own job or any other. Objection at 8 n.13 (quoting Record at 64); *see also id.* at 12-13 & n.17.

Lampron rejoins that (i) Liberty disclosed in the *Ganem* case that it has a "Job Versus Occupation Determinations" PPE (Policies Procedures and Exceptions), (ii) this PPE clearly is

relevant pursuant to 29 C.F.R. § 2560.503-1(m)(8)(iii) and, (iii) in any event, the PPE is relevant because "the distinction between these two terms in the policy is the precise issue upon which the denial of benefits purportedly rested."  Reply at 7.  He cites *Ramsdell* as well as *Ganem* as precedent for the allowance of the requested discovery.  *See id.* at 6-7.

*Ramsdell* and *Ganem* do not help Lampron.  In both, the court noted that the defendant had conceded that certain materials were discoverable, including, in *Ganem*, the PPE that Lampron now seeks to obtain.  *See Ganem*, 2012 WL 5464604, at *3-*4; Supplemental Declaration of Heather Heins (ECF No. 28), *Ganem v. Liberty Life Assurance Co. of Boston*, No. 1:12-cv-128-GZS (D. Me.), ¶¶ 2, 4; *Ramsdell*, 2012 WL 1440613, at *4-*5.

The *Ganem* court did order the defendant to produce, apart from the concededly discoverable documents, any additional materials bearing, *inter alia*, on the job *versus* occupation determination and to supply an affidavit attesting to the existence or non-existence of such materials.  *See id.* at *4.  However, the court did so pursuant to a different mandatory-disclosure subsection than that relied upon by Lampron, 29 C.F.R. § 2560.503-1(g)(1)(v)(A). *See id*.

Even had Lampron invoked that subsection, it would not mandate disclosure of the Job Versus Occupation PPE.  As noted above, subsection (g)(1)(v)(A) mandates disclosure of guidelines, protocols, and the like if "relied upon in making the adverse determination[.]"  29 C.F.R. § 2560.503-1(g)(1)(v)(A).  Heins avers that Liberty already has included in the Record all documents considered in connection with the Lampron benefit determination.  *See Heins Decl.* ¶ 4.  Lampron suggests that Heins must be mistaken, that the PPE was omitted "for reasons unknown," and that the fact of the omission, in itself, constitutes an additional threshold showing of bias.  Reply at 7.  However, in this case, unlike in *Ganem*, Liberty has not conceded that it

failed to provide discoverable material despite Heins' declaration indicating otherwise, *compare Ganem*, 2012 WL 5464604, at \*2-\*4, and Lampron offers nothing other than speculation that, in this case as well, Heins is mistaken.

In *Ramsdell*, the court rejected the plaintiff's bid for discovery apart from the concededly discoverable materials, reasoning:

> Ramsdell has not presented "some very good reason" why this discovery should be allowed.  Ramsdell has not shown how guidelines, policies, and procedures about behavioral health issues, in a generalized fashion, or about resolving disputes between treatment providers and medical providers, more specifically, would be relevant to the core issues in this appeal.

*Ramsdell*, 2012 WL 1440613, at \*5.

Here, as in *Ramsdell*, Lampron fails to show how the Job Versus Occupation PPE would be relevant to the core issues in this appeal.  First, for the reasons discussed above, he fails to make a persuasive showing that Liberty misapprehended the distinction between "own job" and "own occupation" disability.

Second, his reliance on 29 C.F.R. § 2560.503-1(m)(8)(iii) is misplaced.  As noted above, subsection (m)(8)(iii) does not require the disclosure of underlying policies or procedures but, rather, the disclosure of "compliance verification materials specifically generated in connection with the *particular* adverse benefit determination[.]"  *Palmiotti*, 2006 WL 510387, at \*3 (emphasis in original).  Thus, disclosure of the Job Versus Occupation PPE is not mandated pursuant to subsection (m)(8)(iii).

Third, and finally, Lampron fails to make a persuasive case that the termination of his STD benefits rested on a distinction between his ability to perform his job *versus* his occupation, or that any such distinction is relevant.  In both its April 27, 2010, denial letter and its June 9, 2010, letter upholding that denial on appeal, Liberty applied the correct (own job) standard.  *See*

Record at 145 (April 28, 2010, letter stating that the medical documentation did "not support restrictions and limitations precluding you from performing the duties of *your job* beyond March 31, 2010") (emphasis added); 127 (June 9, 2010, letter stating that the "claim determination [was] based on the medical documentation received and whether this would prevent you from returning to work at *your own job*, as a Machinist") (emphasis added).  The question presented in this case is whether that finding is supported by substantial evidence.  *See, e.g*., *Gannon v. Metropolitan Life Ins. Co.,* 360 F.3d 211, 213 (1st Cir. 2004).  Whether Lampron also was able to perform the occupation of machinist, and any distinctions between Lampron's Pratt & Whitney machinist job and the occupation of machinist, are irrelevant.

## IV. Conclusion

For the foregoing reasons, Lampron's motion for discovery is **DENIED**.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 3rd day of November, 2013.


/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge